## Middleton v. Middleton.

(Decided October 3, 1930.)

B. M. LEE for appellant.

POPE & HUFF for appellee.

OPINION OF THE COURT BY COMMISSIONER HOBSON—
Reversing.

G. W. Middleton and Rachel Middleton were married on February 27, 1901. Each had been married before. She had one child, Marion Carter, 3 years old. He had no children. She was then 23 and he was 29. They lived together as husband and wife about twenty years. On February 7, 1921, he filed an action for a divorce from her, charging adultery and lewd conduct. She filed answer on February 22, 1921, denying the allegations of the petition, alleging also in her answer that he had lived with her until February 7, and had condoned all that she had done previous to that time; that he then had abandoned her, had made false charges of adultery, and shown a permanent aversion toward her. She prayed a divorce from him. He filed a reply on April 11, 1921, denying the affirmative matter in her answer, and pleaded that he had made a settlement with her of their property rights on February 18, 1921. On September 13, 1921, an order was made allowing her $100 a month as alimony until the hearing of the case. On November 11, 1921, he took depositions in the case. Her deposition was taken about December 12, 1921, in which she disclosed that she expected a child to be born about January 1, that her husband left her in April and that he was the father of the child. The child was born late in December. She filed an amended answer and counterclaim on February 1, 1922, setting up the birth of the child, and in the meantime she had taken a number of depositions. On February 1, 1922, the case was submitted. She was adjudged a divorce and the custody and care of the infant children. He on that day conveyed to her the home place and also four other dwelling houses and lots, and she accepted this property and the personal property and the live stock she had in satisfaction of her claim for alimony. As a further consideration for the maintenance and education of the children he conveyed to her, during her life and at her death to their children,

two other lots of land, including the commissary leased by the Harlan Co-operative Coal Company, which lease was assigned to her, the rental of $100 a month to be collected by her and used for the maintenance and education of the children, and this agreement was made the judgment of the court. They then had the following children: William Floyd, 19; Charles, 18; Martha, 16; Lewis, 11, Lora, 9; Fanny, 7; Cora, 4; Dottie, about 2 months old. The case was then stricken from the docket at his cost. Thus things stood until August 24, 1925, when she, pursuant to notice, moved the court to redocket the case and make her an additional allowance of $125 a month. On this motion she filed a petition setting out the previous proceedings, alleging that G. W. Middleton had property of the value of $150,000; that he paid nothing for the education and support of the children; that the rent for the commissary had been paid until August, 1923; that then the company failed and for nearly a year the property was vacant, and since then she had only been able to realize $25 a month rent. She alleged that $125 a month was a reasonable amount to be allowed for the education and support of the children, and prayed judgment for this amount and for the loss on the rent of the property. The circuit court declined to open the judgment on the ground that it was a final judgment entered by agreement. On appeal to this court, the judgment was reversed. See Middleton v. Middleton, 218 Ky. 398, 291 S. W. 359.

On the return of the case to the circuit court, the issues were made up and a large amount of proof was taken. On final hearing the circuit court entered a judgment that G. W. Middleton pay Rachel Middleton $1,200 for the year she received no income from the commissary property, also the sum of $954.92 from August 1, 1924, to August 24, 1925, during which time she received an income of $25 a month from the property. It was further adjudged by the court that he pay her the further sum of $125 a month, beginning August 24, 1925, for the maintenance and support of the five infant children until the date of the judgment, September 26, 1929, and on this sum the plaintiff was given credit of $1,200 for sending the two oldest boys to school for two years and the further sum of $25 a month, rental collected from the property since the filing of her motion for an increase. It was further ordered that the three infant children, Fanny Middleton, 13, Cora Middleton, 11, and Dottie Middleton,

7, years of age, remain in the custody of the mother and that G. W. Middleton pay her for their maintenance and education the sum of $25 per month each month during the minority, and, as each arrived at age, the judgment shall decrease by $25 a month. The custody of the two oldest boys, Louis Middleton, 18, and Lora, 16, was awarded to G. W. Middleton, provided he sent them to a good respectable school for the entire school year until they were 21 years, but, if he failed or refused to send the boys to school, then the custody of them should remain with the mother, and the plaintiff should pay her $25 a month for each child reverting to her until his majority. If in vacation the boys remain with their mother he should pay her a like sum for each of them during the time they remained with her for board and lodging. The court fixed the amount due at the date of the judgment to be the sum of $5,739.08, for which judgment was entered in favor of the mother with cost, and execution was awarded. G. W. Middleton appeals.

The proof shows that at the date of the judgment William Floyd was 26 years old, Charles was 24, Martha was 22, and that each of them was married. Louis had been sent to school by his father to the military school at Sweetwater, Tenn., for the years 1927-28 and 1928-29. Lora had been sent by his father to the same school for the last year. The proof was taken and the case was submitted before the school year 1929-30 began, and it does not appear what arrangements were made for the boys that year. The proof shows that the schooling of these boys at this school cost G. W. Middleton at least $1,200 a year each, including clothes and traveling expenses. The proof also shows that Middleton owns property the value of which as assessed is $38,000 in all, and that he owes at least $15,000. He has married again, and is living with his present wife. They have had one child born to them, but it has died. He deeded the old home to Rachel Middleton. The house cost him $5,000. It stands upon a nice lot. He values the place at $8,000. The four houses and lots he conveyed to her she rents for $15 a month each. So she has an income of $60 a month from these houses. She lives at Evarts, which is a mining town, and takes boarders in her home. The three girls go to the public school at Evarts.

G. W. Middleton insists that he is not the father of Dottie, and he has never recognized her as his child. On the other hand, Rachel Middleton says that her husband

did not abandon her until he went to Dawson Springs late in April, 1921, or about eight months before the child was born.

The proof shows that the agreed judgment of February 1, 1921, came about in this way: G. W. Middleton had a large number of witnesses subpoenaed to prove the allegations of his petition against his wife. Her son, Marion Carter, armed himself with a pistol and appeared where the depositions were to be taken, threatening that he would kill at sight any man who testified against his mother. Things went so far that the lawyer for Mrs. Middleton took the lawyers for him aside and suggested that they had better not go ahead, that somebody might get killed. They adjourned the taking to another day and another place, and on the second meeting the same thing happened again, and finally G. W. Middleton, for fear that somebody would be killed and at the suggestion of the attorneys, agreed to make the deeds above referred to, and pursuant to the agreement the deeds were executed and the agreed judgment was entered February 1, 1922.

G. W. Middleton started in life with nothing, working for $10 a month. He turned over to his wife, when they separated, the most revenue producing property he had, but after this he erected forty or fifty small tenant houses on his land, which he rents out, but he did this on borrowed money, and so is considerably involved in debt. For some years before the separation and ever since he has been in poor health and unable to do any sort of manual labor, but is a good trader and able to look after his property. He always treated Marion Carter as one of his children. Carter grew to manhood in the family; then went in the army. Middleton sent him money there, and when he was discharged from the army he got married. Middleton gave him a nice home, deeded the house without charge, just as though he was one of his own sons. He sent his oldest son, Floyd, to Harlan for two years; then sent him to Berea College for over a year; then sent him to the Bowling Green Business University until he finished; and then sent him one year to Union College at Barbourville; then sent him for two years to a school of pharmacy in Tennessee and in Louisville. A large part of this was after the separation. After Floyd returned from the school of pharmacy, his father set him up in business as a druggist in Evarts,

and he testifies that he spent on this son in all around $20,000.

When Charles was 15 years old, he refused to go to school, and he did not go any after that. Soon after this he left home and went off with some show people, and after this got into the bootlegging business and gave his mother and father both a great deal of trouble. When he got married, his father gave him a home.

The daughter Martha married Frank Davis about the time this controversy arose, or a little before. Her father had sent her to Mt. Vernon for two terms and wished to send her to Berea or to a business school, but she refused to go, and soon after this got married, and is living with her husband.

Joe Cawood, a merchant in Evarts, testified that Middleton and the members of his family got things at his store which were delivered to them, such as clothing. and the like, and that what the boys got would run around $20 to $30 a month for the last three years; that Middleton paid all the bills. At one time they got some things that Middleton thought they ought not to buy, and he notified Cawood not to sell to them without an order from him.

Dr. Mouser, a dentist at Evarts, testified that he did the dental work for the family, amounting to about $100 between 1925 and 1928, and that G. W. Middleton paid it.

Dr. Lewis, who is a physician at Evarts, testified that he did the medical work for the family; that Mrs. Middleton paid him a part, Charlie paid him a part, and the father, George Middleton, paid part. He did not remember the amount paid, but he said his services included some spells of typhoid fever.

Appellee proved by several witnesses that Middleton's property was of value from $100,000 to $200,000. But on the other hand he testifies that it is assessed at its fair value, and the circumstances would rather indicate that the value of the property depends upon the coal business, and that the tenant houses would have but little value but for the operation of the coal mines.

It is earnestly insisted for appellant that, if the rent of the commissary had risen to $200, appellant would have been without remedy, and that the same rule should follow when the rent fell below $100 a month. But this was precisely the question that was decided on the former appeal. Section 2123, Kentucky Statutes provides: "Pending an application for divorce, or on final judg-

ment, the court may make orders for the care, custody and maintenance of the minor children of the parties, or children of unsound mind, of any of them, at any time afterward, upon the petition of either parent, revise and alter the same, having in all such cases of care and custody the interest and welfare of the children principally in view.'

After setting out the statute, and as the basis for the reversal of the judgment on the former appeal, the court said: ''The manifest purpose of the statute was to always keep it in the power of the chancellor, upon the application of either parent, to change or modify its orders as to allowances for maintenance and education when the changed conditions justify it.'' 218 Ky. 401, 291 S. W. 359, 360.

But, although the court had authority to modify the judgment, having the interest and welfare of the children principally in view, the judgment remained in force as long as it was acquiesced in by both parties, and determined their rights. Appellant was not indebted to appellee in any sum on August 24, 1925, when she entered a motion to modify the judgment. The children had been cared for up until that time. The interest and welfare of the children in no way entered into the question whether appellant should make good to appelleee the rent she had lost. She had in fact no cause of action against him for this money. The court had authority to modify the judgment, having principally in view the interest and welfare of the children. But such modification would only take effect from the time the application was made, for, until the judgment was modified, it determined the rights of the parties. Either party could go into court at any time and ask for a modification of it, but neither could complain of the status it fixed until this was done. When appellee moved to modify the judgment and appellant resisted its modification, the court properly, in the final judgment, made the judgment to take effect from the time the motion was entered. But, as Middleton was in the state and there was no prior obstruction on his part, it should have gone no further; it not appearing that the interest or welfare of the children required this. Myers v. Myers, 62 Utah 90, 218 P. 123, 30 A. L. R. 74; Sistare v. Sistare, 218 U. S. 1, 30 S. Ct. 682, 54 L. Ed. 905, 28 L. R. A. (N. S.) 1068, 20 Ann. Cas. 1061, and cases cited; Parks v. Parks, 209 Ky. 127, 272 S. W. 419.

The judgment against Middleton for $1,200 for the year that appellee received no rent from the commissary and also for $954.92, for the subsequent time up to the making of the motion for a modification of the judgment, was unwarranted. The court could modify the judgment as to the future, but not as to the past, on the facts shown.

As for the amount of allowance for the future, the court is satisfied from the record as a whole that, if the rent of the commissary had not failed, this controversy would not have arisen. The fact is, the amount of $100 a month for the support of the children was fixed by agreement between Middleton and his wife's attorneys without the consent or concurrence of his attorneys, and it was the same amount as the court had fixed previously. While there is some proof in the record that the cost of living has increased, there is also proof that living expenses are not as high at Evarts now as they were in February, 1922, when the agreement was made. But, however this may be, clearly after three of the children were of age and married the decrease in the size of the family would certainly make up for any difference. The court therefore concludes that the amount should have been fixed at $100 a month, and from this should be deducted the $25 a month that Mrs. Middleton was collecting from the commissary. In addition to this appellant had sent Louis and Lora to college as above stated, and he had paid not only their expenses at college, but also for their clothes and other things at home. The circuit court allowed him a credit of $1,200 for this, which will not be disturbed. The order fixing $25 a month as the allowance for maintenance and education of three little girls is approved, subject to the $25 a month rent received by appellee.

The custody of the two boys, Louis and Lora, was properly awarded the father, G. W. Middleton, and he should send them to school if they will go, and if he fails to send them to school when he should, the matter may be presented to the court; but, as the custody of the sons is committed to him, he should have charge of them and should determine where they shall live and what they shall do when not in school, until they are 21 years old. The father is entitled to the earnings of the sons until they are 21 years of age and there is no reason that they shall remain idle if they are not in school. One of them

weighs over 160 pounds, and the other is also able to work. If they wish further education, the father should furnish it until they are 21 years of age.

Judgment reversed, and cause remanded for a judgment as above indicated.